## JACKSON *v.* CITY OF ALLEGHENY.

*(District Court, W. D. Pennsylvania. April 1, 1890.)*

1. WHARVES—DUTIES OF WHARFINGER—FLOATING COAL-YARD.

Libelant had long been in the exclusive occupancy of a certain portion of the public wharf of Allegheny city, paying a stipulated monthly sum for wharfage, and he kept fastened to shore two floats on which he carried on the business of a retail vender of coal, having thereon an office and scales; and one of the floats having aprons to shore, over which wagons were driven. His practice was to buy cargoes of coal, and have the loaded barges brought to the floats and there kept until he had retailed the coal. *Held,* that the city did not owe to him the high measure of care due from a wharfinger to navigators invited to a public wharf for safe mooring, and using the same in the ordinary way.

2. SAME—MOORING POSTS—DESTRUCTION—NOTICE.

The city granted a right of way along its public wharf to a railroad company, which, in the exercise of the privilege, cut away several check-posts convenient to libelant's floats and available to him, and the city did not replace them, nor provide substitutes. There remained, however, a check-post and ring-bolt which libelant used, and he did not complain of the removal of the posts, nor give notice to the city to replace them, and did nothing himself to add to his appliances for tying. This state of things continuing for several months, the libelant's floats and cargoes of coal in boats were swept away by a flood in the river, the check-post and ring-bolt standing firm, and the break being in the fastenings. *Held,* that the city was not liable for the libelant's loss.

In Admiralty.

*L. C. Barton,* for libelant.

*Wm. B. Rodgers* and *Geo. Elphenstone,* for respondent.

ACHESON, J. The libelant sues the city of Allegheny, the proprietor of a public wharf on the bank of the Allegheny river, to recover damages for the loss of one float and injury to another, and also for the loss of certain coal contained in flat-boats, which were swept away from said wharf on the 4th day of February, 1883, by an ice flood. The libel charges that the loss was occasioned by the failure of the city to perform the duty which, as wharfinger, it owed to the libelant, in that the city neglected to provide and maintain sufficient posts, ring-bolts, and other devices necessary for the secure mooring of said floats and flat-boats; and the specific complaint therein made is that the city, by an ordinance, granted to the Pittsburgh & Western Railroad Company the right of way for its railroad over and along the public wharf, and permitted the company, in constructing its railroad, etc., to cut down or destroy certain posts, etc., necessary for fastening and securing boats and craft landing and mooring at said wharf, "and failed and neglected to replace the same, or to furnish substitutes for the same, although often requested and notified by the libelant and others so to do." The answer is responsive to the libel, and denies all the allegations upon which the libelant's right to recover depends.

The material facts of the case as disclosed by the evidence are these: The libelant had been the exclusive and constant occupant of that portion of the river shore where his flats lay on February 4, 1883, for a period of 10 years prior to that date, and for the use thereof he paid the city the sum of $15, monthly. Testifying in his own behalf, the libelant says: "I had a lease from Allegheny city for this wharf." And again he states: "I had a lease during all that time. I occupied it by the year. I paid the wharfage every month,—$15 per month." There was, it would seem, no written or formal lease, but the libelant's long-continued occupancy had been of the same distinct portion of the landing or wharf, for the monthly sum mentioned, and his possession thereof was both permanent and exclusive. He there carried on the retail coal business, and to that end maintained at that place two floats. Those floats had no rudders or means of locomotion, and were not intended for navigation, but were kept fastened to the shore. On one of the floats was the sign "Jackson's Coal." The larger one was a decked float, and on it the libelant had an office in which his books were kept, and his busi-

ness generally was conducted. There was a pair of scales for weighing coal on that float, and two aprons extended therefrom to the shore, over which wagons were driven to and from the float. The libelant had teams and wagons for delivering the coal to his customers, and the wagons were driven on the float and there loaded. The libelant testifies: "The coal was kept in the barges, and the barges were tied to the float, and the wagons driven on the float and loaded from the barges." His practice was to buy cargoes of coal, and have the loaded barges or flats brought to his float, where the boats were kept until he had retailed the ' coal, and when the boats were empty the owners would take them away. In this state of affairs, on February 4, 1883, a sudden and rapid rise of the Allegheny river occurred, the ice breaking and running out on the morning of that day.. At the time the libelant had in use a check-post, which stood on the bank of the river near the foot of Sandusky street, and a ring-bolt firmly attached to the wharf some distance lower down the stream, and to these the libelant's floats were fastened by chains and a line. Both post and ring-bolt proved to be sufficient to stand the strain to which they were subjected, but large cakes of ice got in between the floats and the shore, and, under the pressure of the flood and the action of the ice, the chains broke, and the floats and flat-boats were carried off.

Under the proofs the only ground upon which there could possibly be a recovery by the libelant is the alleged negligence and breach of duty on the part of the defendant in not replacing, or providing substitutes for, certain check-posts,—two in number, according to the libelant's witness Hamilton,—which were removed when the Pittsburgh & Western Railroad Company widened its track, or put in a switch at that place. The exact time when those posts were cut away is left in doubt, but, under all the evidence, it may be safely assumed that it was at least several months before February, 1883. At the time this occurred the libelant was in the exclusive occupancy of his portion of the wharf, using it in the manner and for the purposes already set forth, and he certainly then knew the fact that those posts had been removed. The allegation of the libel that the defendant was requested and notified by the libelant and others to replace said posts or furnish substitutes is unsupported by any evidence; and upon the facts proved it cannot be pretended that the libelant made any complaint about the removal of the posts, or that any request was made or notice given by him, or by any one else, to the wharfmaster, or to any official of the city, to restore the posts or provide substitutes. The libelant relies upon the decisions of the supreme court of Pennsylvania adverse to the city in the cases of *City of Allegheny* v. *Campbell*, 107 Pa. St. 530, and *Willey* v. *Allegheny City*, 118 Pa. St. 490, 12 Atl. Rep. 453. But in the former case there was the element of actual and timely notice to the city to remedy the defects, and both cases involved the rights of navigators, which the court adjudicated in conformity with the principles previously settled in *Pittsburgh* v. *Grier*, 22 Pa. St. 54. That this is a correct exposition of the rulings of the court in those cases is verified by the opinion of the supreme court in the more recent case of *Crawford* v. *City of Allegheny*, 16 Atl. Rep. 476.

But the libelant's use of the premises he occupied was not the ordinary use of a wharf by navigators. Id. Indeed, he was not a navigator in any proper sense of the term. Moreover, he paid no wharfage on the barges and flat-boats which were brought to his float and there kept while he retailed the coal contained therein. The libelant's statement that he "was under the direction of the wharfmaster of Allegheny city," is a bald assertion, unsupported by any fact in the case. The portion of the river shore he used was practically surrendered into his exclusive possession. To all intents and purposes he was lessee of the premises at a fixed rental. Such, evidently, was the libelant's own understanding on the subject, as appears from his testimony quoted above. In simple truth he maintained at this place a floating coal-yard, where he carried on the business of a retail vendor of coal. I am of opinion, then, that the defendant did not owe to the libelant the high measure of care which is justly due from a wharfinger to navigators whom he invites to bring to his wharf craft for safe mooring. *Crawford* v. *City of Allegheny, supra.* Now the libelant had been so long in the occupancy of these premises that he knew perfectly the perils which were to be expected from the periodical floods which occur in the Allegheny river; and, furthermore, what appliances were necessary for the security of his floats was a matter peculiarly within his own personal knowledge. Therefore, and inasmuch as he uttered no complaint when the posts were removed, made no request to any city official to have them replaced, and did nothing himself to provide substitutes, it may reasonably be inferred that he regarded the appliances which remained as sufficient for his purposes. How otherwise can his conduct be explained? But if his own judgment was that he had sufficient appliances for security, how can negligence fairly be imputed to the city? Then, again, in fact the check-post and ring-bolt to which the libelant tied on the occasion of the ice flood stood firm. The break was in the fastenings. And here it must be noted that there is considerable testimony tending to show that the libelant did not have proper lines and lashings, and, further, that he failed to exercise that reasonable foresight and care for the protection of his property which the circumstances called for. But, finally, it is by no means clear that the catastrophe would have been averted had other posts been available to and used by the libelant. Being interrogated by the libelant's counsel on that very point, the witness Hamilton declined to express any opinion as to what might have been the result had there been additional fastenings to other posts. The burden is upon the libelant to show both negligence on the part of the defendant, and that such negligence caused, or at least contributed to, the disaster. But neither of these things, in my judgment, is sufficiently established. And, without further discussing the evidence, I content myself with saying that, upon the whole case, I am not satisfied that the libelant has any just cause of action against the defendant. Having reached this conclusion on the merits of the controversy, it is not necessary to consider the jurisdictional questions raised by the answer. Let a decree be drawn dismissing the libel, with costs.